Matter of Chesebro (2025 NY Slip Op 03855)

Matter of Chesebro

2025 NY Slip Op 03855

Decided on June 26, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 26, 2025

PM-143-25
[*1]In the Matter of Kenneth John Chesebro, a Suspended Attorney. (Attorney Registration No. 4497913.)

Calendar Date:May 27, 2025

Before:Garry, P.J., Pritzker, Reynolds Fitzgerald, Ceresia and Mackey, JJ.

Monica A. Duffy, Attorney Grievance Committee for the Third Judicial Department, Albany (Alison M. Coan of counsel), for Attorney Grievance Committee for the Third Judicial Department.
Tesser, Ryan and Rochman, LLP, White Plains (Randall Tesser of counsel), for respondent.

Per Curiam.
Respondent was admitted to the practice of law in this state in 2007, and he has also been admitted to practice in Massachusetts, New Jersey, California, Texas, Florida and Illinois. In October 2023, respondent pleaded guilty to a single count of a multicount indictment charging him with the Georgia felony of conspiracy to commit filing false documents. Respondent's indictment had arisen in connection with his involvement, along with 16 codefendants and others, in a scheme to submit false election results to Congress concerning the 2020 presidential election. The Attorney Grievance Committee for the Third Judicial Department (hereinafter AGC) thereafter moved to strike respondent's name from the roll of attorneys due to his felony conviction or, alternatively, to impose discipline upon respondent as a consequence of his commission of a "serious crime" (Judiciary Law § 90 [4] [d]). By affirmation of counsel, respondent opposed AGC's motion, AGC was heard in reply, and the parties were heard at oral argument on the issues of whether respondent's conduct constitutes a felony, serious crime or otherwise and, if his conduct constitutes a serious crime, whether respondent should be suspended on an interim basis pending a further hearing and a final order disposing of the matter. By October 31, 2024 order, we partially granted AGC's motion, finding respondent to have committed a serious crime and suspending him from practice pending our determination of a final disciplinary sanction (231 AD3d 1473 [3d Dept 2024]). Upon respondent's request, the matter was referred to a referee and a hearing on mitigating and aggravating factors was held in December 2024. The Referee's report has been supplied to the parties, and they have since been heard as to the Referee's report and the recommendation as to sanction to be imposed.
The Referee's report details that, in 2020, respondent assisted Donald Trump's Presidential campaign with its Wisconsin litigation, authoring a memorandum in November 2020 entitled "The Real Deadline for Settling a State's Electoral Vote." In that document, respondent argued that the "real deadline" for a finding by a court in favor of the President and Vice President is January 6, the date upon which the US Senate and House of Representatives meet for the counting of the electoral votes. Based on this conclusion, respondent surmised that, despite not having won the popular vote, if electors met at the Capitol in Wisconsin on December 14, 2020 — the date upon which electors must vote in their respective states — and cast their votes in support of Trump, a court decision or legislative determination rendered after December 14 in favor of that slate of electors should be considered timely, unless the race had been conceded.
While respondent testified that he initially served in a pro bono capacity limited to assisting the Wisconsin campaign — with respondent working with James Troupis, the Trump campaign's counsel in Wisconsin — respondent admitted [*2]to later agreeing to assist with work in other states where alternate electors were being implemented, including Georgia. Shortly thereafter, respondent provided Trump campaign officials with a packet of documents, which included detailed instructions for how the Georgia electors may cast votes, as well as a proposed "Certificate of Votes of the 2020 Electors from Georgia." The Certificate contained language to the effect that the signatories were duly elected and qualified electors for President and Vice President of the United States from the State of Georgia. While the Referee noted that respondent suggested a change to the Certificate, which had been prompted by concerns raised by Pennsylvania delegates, and sought to convey that the votes submitted were contingent on the outcome of litigation, respondent's suggestions were not implemented, as the putative Georgia electors met on December 14, 2020, voted and executed a Certificate containing respondent's original language.
The Referee considered the collaborative nature of respondent's offense, indicating that his level of involvement is a factor to consider in terms of mitigation and aggravation (see e.g. Matter of Shore, 163 AD3d 150, 152 [2d Dept 2018]). On this point, the Referee noted that, despite efforts to combat the description that respondent was the "architect" of Trump's efforts to overturn the 2020 election, the testimony and documentary evidence produced at the hearing fully support such a claim, inasmuch as respondent's legal analysis and implementation guidelines fueled the effort. Respondent's testimony likewise revealed that, while he initially attempted to limit his scope of representation, advising Trump campaign officials that he would provide "a general framework" for how the electoral votes are cast and provided "rough materials" — including the proposed Certificate — the Referee concluded that the documents respondent provided to the Trump campaign were neither rough nor general. Moreover, respondent was asked whether he regretted any aspects of his representation of the Trump campaign, to which respondent regretted that he "wasn't more clear in the cover memo to the electors in each state, including Georgia . . . and wasn't more clear about points made in cover emails [he] sent to the Trump campaign about how [he] was just providing rough materials." While respondent opined his belief that he had carefully explained his role to his client, he testified that his work product — which he described as being in a "nice, polished, clear form" — led the electors and attorneys in each state to believe that everything was final, vetted and that nothing needed to be reviewed. On this point, respondent expressed his regret that, in Georgia, unlike other states, he had not engaged in dialogue with state-specific individuals, wherein he could answer questions and clarify his role.
Next, the Referee found that respondent's substantial experience in the practice of law was a relevant [*3]factor (see ABA Standards for Imposing Lawyer Discipline standard 9.22 [i]), referencing his work in various high-profile cases. Respondent testified regarding his work on various legal matters, including assisting with the Bush v Gore litigation and filing amici briefs (see American Ins. Assn. v Garamendi, 539 US 396 [2003]; Kumho Tire Co. v Carmichael, 526 US 137 [1999]; Ivy v Diamond Shamrock Chemicals Co., 510 US 1140 [1994]). The Referee also considered respondent's lack of a disciplinary history prior to his Georgia criminal matter, noting that, following his conviction in Georgia, he was suspended in California, New Jersey and Massachusetts, all of which remain pending, although respondent contended that his suspension in Massachusetts was "erroneous" as he had retired in that jurisdiction in June 2023, but the Referee noted that there was no evidence in the record to support this claim. Likewise, the Referee indicated that respondent was suspended in Florida and that Illinois — where his law license is inactive — commenced a disciplinary investigation as to his Georgia conviction. Lastly, the Referee noted that respondent is also admitted in Texas, but he is not the subject of a disciplinary proceeding in that state.
As to his obligations to report his conviction to both this Court and AGC, the Referee noted that respondent failed in this regard (see Judiciary Law §90 [4] [c]; Rules for Atty Disciplinary Matters [22 NYCRR] § 1240.12 [a]), and likewise admitted his failure to report his suspensions in California, New Jersey, Florida and Massachusetts, as well as suspension in various federal courts (see Rules for Atty Disciplinary Matters [22 NYCRR] § 1240.13 [d]). On this point, the Referee found respondent's testimony telling, wherein he indicated his belief that AGC was aware of the suspension, and that such belief was based on various "notifications" from other bars, as well as his opinion that his plea was common knowledge given the notoriety of the matter. Likewise, respondent indicated that he was "overwhelmed," ultimately apologizing that he should have "paid attention to each of the bars."
As to the penalty to be imposed, the Referee considered that respondent "was convicted of a serious crime arising out of his participation in a plan to disrupt the lawful function of our government and to overturn the results of a presidential election" (see ABA Standards for Imposing Lawyer Discipline standard 9.22 [k]). While respondent expressed some remorse for his actions (see ABA Standards for Imposing Lawyer Discipline standard 9.32 [l]), specifically regarding the clarity of his advice, the Referee noted that he expressed no sincere regret for his actions, further indicating that his "cavalier attitude" to his reporting obligations to state disciplinary authorities demonstrated his hubris, particularly his belief that social media and press coverage would provide the requisite notice concerning his conduct. Notwithstanding all of respondent's [*4]conduct, the Referee concluded that, inasmuch as his testimony revealed that he has been criminally indicted in Wisconsin, such indictment preempts a final disposition of this matter. Accordingly, she recommended that respondent's suspension remain in effect pending the outcome of the Wisconsin criminal matter.
Turning to the parties' submissions concerning the Referee's report, we acknowledge that AGC seeks to confirm the report, although it objects to the Referee's recommendation as to sanction. Conversely, respondent — while agreeable to the recommendation as to sanction — largely objects to the Referee's findings, arguing that they are not supported by the evidence, and that the report overlooks mitigating factors supported by the record. It is noted that respondent's objections largely challenge the Referee's conclusions that respondent was the "architect" of a scheme to overturn the 2020 election results, and he further argues that the absence of the element of moral turpitude in respondent's Georgia criminal conduct precludes such a finding. On these points, respondent argues that he had no role — outside of Wisconsin — for deciding when and where alternate electors would be deployed. Nonetheless, respondent provided the Trump campaign with the legal framework and documents for it to challenge election results, including the very language utilized in the Certificates that formed the basis of his criminal plea in Georgia. Accordingly, the fact that respondent's criminal conduct did not involve an element of moral turpitude does not preclude the Referee's conclusion that he created a legal theory and framework utilized by others in an attempt to challenge valid election results, and that such acts served to aggravate his conduct.
Turning next to respondent's arguments concerning his lack of knowledge that the Trump campaign failed to implement his suggested changes to the Certificate in Georgia, it is noted that, despite respondent's arguments to the contrary, the Referee did credit his testimony on this point, with the Referee noting that he "did make an effort to correct the language that later formed the basis for his guilty plea" through his suggested changes to the Certificate, which were ultimately not implemented by the Trump campaign. On that point, while respondent argues that that he did not learn of the campaign's failure in this regard until sometime in 2022, the Referee's conclusion that he continued to provide legal services to the campaign notwithstanding its failure to accept his advice is supported by the record. Respondent's testimony revealed his belief that, had his suggested changes been made, he would not have been guilty of the crime to which he ultimately pleaded guilty, but the record notably includes his email to the Trump campaign that contained the "suggested language," as well as respondent's belief that "it might be worth suggesting" to other electors. Now, respondent takes the position that these changes were [*5]not merely recommended, but rather required in order to lawfully align with his legal opinion. Surely, an attorney with respondent's background — not only in constitutional and election law, but also in complex representation involving multiple legal teams— would be aware of his obligations to appropriately address a significant conditioning factor of his opinion and insist that the campaign's state-specific legal team address the matter, as opposed to just providing suggested language that the campaign should feel free to adopt or disregard. Accordingly, the Referee's findings that respondent's continued representation of the Trump campaign despite its failures to implement his changes — notwithstanding respondent's lack of knowledge of same — and his lack of remorse concerning his conduct are warranted, supported by the record and thus may appropriately serve as aggravating factors.
As to the penalty to be imposed, we decline to follow the Referee's recommendation to continue respondent's suspension pending our receipt of evidence concerning the final disposition of respondent's Wisconsin criminal matter, inasmuch as we have already concluded that respondent's conviction in Georgia constitutes a serious crime within the meaning of Judiciary Law § 90 (4) (d) (see 231 AD3d at 1478). We note that respondent's criminal conduct — conspiracy to commit filing false documents — is unquestionably serious, inasmuch as he admitted to unlawfully conspiring to knowingly file a document in a public record having reason to know that such document is false or contains a materially false, fictitious or fraudulent statement or representation, with one or more of the coconspirators doing any overt act to effect the object of the conspiracy (see Ga Code Ann §§ 16-4-8, 16-10-20.1 [b] [1]). On that basis alone, respondent's conduct brings into question his integrity and fitness to continue engaging in the practice of law in New York (see Matter of Scott, 54 AD3d 1145, 1145 [3d Dept 2008]; Matter of Van Riper, 290 AD2d 572, 573 [3d Dept 2002]). On a larger scale, however, respondent's conduct, which is further detailed through his extensive testimony and the documentary evidence produced at the hearing, "strike[s] at the heart of the administration of justice" (Matter of Reich, 32 AD3d 1106, 1106 [3d Dept 2006]), and undercuts the very notion of our constitutional democracy that he, as an attorney, swore an oath to uphold. Moreover, his cavalier attitude regarding his actions, particularly in the face of his extensive background in the areas of constitutional and election law, largely aggravates his conduct, notwithstanding his lack of disciplinary history (see generally Matter of Guiliani, 230 AD3d 101 [1st Dept 2024]). Given the testimony and evidence produced at the hearing, we conclude that respondent should be disbarred based on his conviction of a serious crime.
Garry, P.J., Pritzker, Reynolds Fitzgerald, Ceresia and Mackey, JJ., concur.
ORDERED that respondent [*6]is disbarred and his name is stricken from the roll of attorneys and counselors-at-law of the State of New York, effective immediately; and it is further
ORDERED that respondent is commanded to desist and refrain from the practice of law in any form in the State of New York, either as principal or as agent, clerk or employee of another; and respondent is hereby forbidden to appear as an attorney or counselor-at-law before any court, judge, justice, board, commission or other public authority, or to give to another an opinion as to the law or its application, or any advice in relation thereto, or to hold himself out in any way as an attorney and counselor-at-law in this State; and it is further
ORDERED that respondent shall comply with the provisions of the Rules for Attorney Disciplinary Matters regulating the conduct of disbarred attorneys and shall duly certify to the same in his affidavit of compliance (see Rules for Atty Disciplinary Matters [22 NYCRR] § 1240.15).